**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **GOM SHELF LLC** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:23-CV-02325** |
| | § | |
| **QUARTERNORTH ENERGY LLC** | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

---

## PLAINTIFF'S FIRST AMENDED COMPLAINT

---

Plaintiff GOM Shelf LLC ("GOM Shelf") file this First Amended Complaint against QuarterNorth Energy LLC ("QNE"), and would show the court as follows:

### I.   INTRODUCTION

1.     This case is about QNE's betrayal of GOM Shelf's trust through, among other things, a multi-million dollar cash-grab.

2.     GOM Shelf is the owner of various offshore oil and gas wells, platforms and other facilities situated in the shallow water of the Gulf of Mexico (the "Assets").   GOM Shelf empowered and entrusted QNE to properly and prudently operate these Assets on GOM Shelf's behalf.  GOM Shelf also trusted QNE to market the oil and gas produced by GOM Shelf's Assets, collect the revenues generated by these Assets, and disburse those revenues to GOM Shelf.  In return for these and other services, GOM Shelf handsomely paid QNE, to the tune of tens of millions of dollars.

3.      While QNE was supposed to be working on GOM Shelf's behalf, it was actually lining its own pockets.  QNE induced GOM Shelf to overpay many millions for QNE's chronically deficient services as more particularly described below.

4.      When it came time for QNE to give GOM Shelf the remainder of GOM Shelf's revenues, without any authorization or authority, QNE held more than $6 million of GOM Shelf's revenues hostage and demanded payment for various costs that QNE alleged to have incurred.

5.      GOM Shelf's efforts to recover its misappropriated revenues from QNE have been met with obstruction, obfuscation, and threats of retaliation.  And, through this saga, GOM Shelf has learned that QNE's improper withholding is only the tip of the iceberg of QNE's wrongdoing. Left with no other recourse, GOM Shelf brings this action to reclaim what QNE has wrongfully taken.

## II.   JURISDICTION AND VENUE

6.      This Court has personal jurisdiction over QNE because it has its principal office in Harris County, Texas.  *See* Tex. Civ. Prac. & Rem. Code § 15.002(a)(3).

7.      This Court has subject-matter jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1), because this case arises from a Transition Services Agreement between GOM Shelf and QNE which concerns the operation of various oil and gas assets owned by GOM Shelf.  A substantial majority of these assets are located off the coast of Louisiana on the Outer Continental Shelf.

8.      Venue is proper in the Southern District of Texas, Houston Division because the August 27, 2021 Transition Services Agreement between GOM Shelf and QNE specifies any court sitting in Houston, Texas as the appropriate venue.  *See* Transition Services Agreement (the

"TSA"), attached hereto as Exhibit 1, at § 7.13.  Moreover, a significant portion of QNE's conduct which gave rise to Plaintiff's claims occurred in Harris County, Texas.

### III.    GOVERNING LAW

9.    Pursuant to 43 U.S.C. § 1333(a), this action is governed by Federal law. To the extent that the laws of Louisiana – the "adjacent state" – are applicable and not inconsistent with Federal laws, Louisiana laws are adopted as Federal law for the purposes of this action.  43 U.S.C. § 1333(a)(2)(A).

### IV.    FACTUAL BACKGROUND

10.    Plaintiff GOM Shelf is a Texas Limited Liability Company with its principal place of business in Montgomery County at 2107 Research Forest Drive, Suite 250, The Woodlands, Texas 77380.

11.    Defendant QNE is a Delaware Limited Liability Company with its principal place of business in Harris County, Texas at 3737 Buffalo Speedway, Suite 800, Houston, Texas 77098. QNE may be served with process through its registered agent Capitol Corporate Services, Inc., located at 1501 S Mopac Expy, Suite 220, Austin, Texas 78746.

12.    On or about August 27, 2021, Fieldwood Energy I ("FW I"), Fieldwood Energy III ("FW III"), Fieldwood Energy Offshore LLC ("FEO") and QNE entered into a Contract for Purchase and Sale of Hydrocarbons (the "HPSA") whereby FWI and its wholly owned subsidiary, GOM Shelf, sold all of its hydrocarbon production to FW III.  QNE was the contract operator for FW III and FEO (merged into FW III), and pursuant to the HPSA, was obligated to keep and maintain all FW III's books and records relating to the hydrocarbon sales transactions contemplated under the HPSA. QNE was also obligated to make estimated payments to GOM Shelf for production revenues sold under the HPSA to the Seller no later than the last business day

of the month in which Buyer received the sales proceeds.  The HPSA was later assigned from FW III to QNE and QNE assumed the rights and obligations as "Buyer" under the HPSA.

13.     On or about August 27, 2021, GOM Shelf, FW I, and QNE also entered into the TSA.  Under the TSA, QNE agreed to perform various "Transition Services" in connection with the Assets.  *See* Exhibit 1 at Exh. A (describing the "Transition Services" QNE was required to provide). These services included, among others, "Operating Services," *see* Exhibit 1 at Exh. A, § 1.1, and "managing the collection of any joint interest billings and revenue relating to the Assets," s*ee id.* at Exh. A, § 1.3(c)(iii).   While QNE was responsible for collecting revenues, all such revenues incurred after August 27, 2021 belonged exclusively to GOM Shelf and FW I. *See* Exhibit 1 at § 1.6(d).

14.     QNE further agreed to invoice GOM Shelf monthly for the "actual costs incurred" under the TSA, including the "actual time incurred" by QNE's full time employees in performing services under the TSA.  *See* Exhibit 1 at § 3.1. QNE promised that it would also require its employees to "maintain detailed time records measured in sixty (60) minute increments," *see id.* at § 3.1, and that it would preserve records related to the services QNE performed under that contract, *see id.* at § 1.4.

15.     Despite being paid handsomely, many of QNE's services under the TSA were substandard at best and in some cases, totally insufficient.   Among other deficiencies, QNE failed to perform or poorly performed the following:

> (i) QNE failed to address and collect outstanding accounts receivable incurred during the TSA period resulting in a significant outstanding balance when the TSA was terminated.

(ii)  QNE failed to properly account for all charges and reimbursements relating to buyback gas.

(iii) QNE failed to properly account for all revenues and expenses while it was the contract operator under the TSA.  Due to QNE's poor and deficient accounting, QNE held many unresolved accounting items in "trash can accounts" leaving these items to be resolved by GOM Shelf after termination of the TSA.

(iv) QNE failed to properly maintain the finance and accounting for GOM Shelf's Assets.  Among other things, QNE has failed to justify transfers out of bank accounts owned or controlled by GOM Shelf and related entities, as well as QNE's withholding of interest accrued on GOM Shelf's bank accounts.

16.     From August 27, 2021 through December 31, 2022, GOM Shelf paid QNE for services that QNE reported to GOM Shelf through monthly invoices.  In less than eighteen months, QNE invoiced and GOM Shelf paid more than $50 million for QNE employee time alone.

17.     Shortly following the execution of the TSA, FW I was merged into and survived by GOM Shelf.  A June 24, 2022 TSA amendment reflected that GOM Shelf was now the sole owner of the Assets.

18.     Consistent with § 5.1 of the TSA, GOM Shelf gave notice that it was terminating QNE's services effective December 31, 2022 and that Commodore Offshore Operating LLC ("COOL") would be taking over the operation of GOM Shelf's assets.

19.     In response to this termination, QNE launched measures to shield itself from GOM Shelf's scrutiny.  QNE made available a number of its employees, many of whom QNE was laying

off simultaneously with the termination of the TSA, to interview for new positions with COOL. However, QNE encouraged employees who were pursuing employment with COOL to enter into agreements which required those employees to delete and not access electronic communications related to QNE. QNE's direction to destroy these communications flew directly in the face of GOM Shelf's audit rights under the TSA and deliberately destroyed GOM Shelf's work product and property. *See* Exhibit 1 at § 1.4.

20.     On September 26, 2022, GOM Shelf, QNE, and White Fleet Operating LLC, the parent company of COOL, also entered into a Confidentiality and Transfer Agreement (the "CTA"). Under this agreement, QNE agreed to disclose to GOM Shelf and White Fleet Operating "certain Confidential Information . . . relating to [QNE], and/or [QNE]'s personnel . . . and/or information relating to information technology systems and historical data relating to properties of [GOM Shelf] that are currently managed by [QNE]." The CTA was meant to facilitate "the transfer of certain data, information, files, and personnel from [QNE] to [GOM Shelf and White Fleet Operating LLC]." However, QNE's conduct instead delayed and ultimately frustrated this transfer in several material respects. Among other things, QNE directed certain employees to not share documents and information related to GOM Shelf's Assets and projects with anyone outside of QNE, including GOM Shelf and COOL.

21.     On or about January 9, 2023, QNE sent its final invoice for services under the TSA. Further, at approximately 1:00 p.m. CST on January 31, 2023, QNE sent GOM Shelf a proposed invoice purportedly settling the outstanding production revenues due under the HPSA to GOM Shelf. This invoice arrived only four hours before those revenues were due to be remitted to GOM Shelf. In the invoice, QNE unilaterally deducted more than $6 million from the revenues that QNE owed to GOM Shelf. Further, prior to sending the invoice, QNE made little or no attempt to provide

advanced warning to GOM Shelf or otherwise substantiate the unauthorized deductions from GOM Shelf's production revenues.

22.     QNE alleged in the HPSA invoice that it was withholding these deductions to offset various amounts that GOM Shelf owed to QNE and in some cases to third parties.  Many of these deductions were purportedly related to charges that were several months old and, in some cases, sixteen (16) months old but which QNE asserted *for the first time* at the eleventh hour.  But this was fiction: Nothing in the TSA or the HPSA gave QNE the right to withhold GOM Shelf's revenues in this manner.  Further, nothing in the TSA or the HPSA authorized QNE to net GOM Shelf's production revenues against charges and expenses allegedly owed to third parties.

23.     GOM Shelf immediately objected to QNE's improper and unsubstantiated deductions from its revenues.  Nevertheless, on February 2, 2023, QNE wired GOM Shelf funds in the amount reflected on the January 31, 2023 invoice, which excluded the more than $6 million that QNE continued to withhold.  Over the course of the following several months, GOM Shelf attempted to reconcile the deductions with QNE to resolve this dispute, but its efforts proved fruitless. Rather than offering definitive support for its deductions, QNE put the onus on GOM Shelf to disprove them. All the while, QNE held the information and documents necessary to disprove these deductions.  And, the information which QNE did provide only confirmed that QNE's asserted offsets were inaccurate.

24.     While GOM Shelf was attempting to reclaim its stolen revenues, it learned that QNE's misconduct was far more serious and nefarious than it initially believed.  On April 20, 2023, GOM Shelf received the results of an audit conducted by a third party concerning the amounts that QNE had charged GOM Shelf for QNE's employee time and shared costs under the TSA.  The audit report revealed that, over the term of the TSA, QNE overbilled GOM Shelf in a

gross amount of at least $1,993,308.  This overcharge was conservative, because the auditors were unable to confirm the validity of the hours that individual QNE employees charged on their time sheets.

25.     GOM Shelf immediately sent the audit report to QNE and demanded that it remit to GOM Shelf the improperly billed $1,993,308.  In a response dated April 24, 2023, QNE ignored the allegations of its gross overbilling.  Instead, it threatened to retaliate by charging additional items and costs to GOM Shelf despite the fact that the TSA and the HPSA had terminated.

26.     On information and belief, the amount which QNE overbilled GOM Shelf for QNE's employee time under the TSA is substantially greater than the $1,993,308 uncovered through the third-party audit.  GOM Shelf has only recently discovered that QNE made it a priority to bill GOM Shelf for as much employee time as QNE could get away with.  QNE executives instructed their employees to inflate the hours that they reported on GOM Shelf–related projects. And, when QNE employees did not run-up GOM Shelf's people costs, QNE supervisors pressured them to shift their reported time from QNE to GOM Shelf.  The evidence will likely prove that the damages GOM Shelf has suffered due to QNE's systematic overbilling are significant. For example, if the total employee time that QNE billed was inflated by even just 10%, GOM Shelf's resulting overpayment would number in the several millions.

27.     QNE's manipulation of its reported employee time also inflated the amount of other shared costs that it billed to GOM Shelf under the TSA. *See* TSA at § 3.1(b).  Shared costs were allotted under the TSA based on the percentage of each workday that QNE employees spent on GOM Shelf projects.  *See id.*  In addition to the general exaggeration of employee time described *supra*, GOM Shelf has also recently discovered that QNE executives directed hourly employees to report their hours in a manner which further shifted these shared costs away from QNE and to

GOM Shelf.  Hourly employees were directed to report all the hours they worked on GOM Shelf projects in a pay period first, and only then report any hours worked on QNE projects, for a total of up to 8 hours on all projects per business day.  This resulted in QNE hourly employees reporting that they worked on GOM Shelf projects for a higher percentage of their total hours than was accurate.  The consequence of this reallocation of hours is that QNE invoiced GOM Shelf for a higher percentage of shared costs than GOM Shelf would have owed if the employee time had been accurately reported.  *See* TSA at § 3.1(b).

28.      QNE also directly manipulated third-party invoicing to shift costs away from itself and towards GOM Shelf.  GOM Shelf has uncovered that QNE directed certain vendors to repeatedly disproportionately assign third party invoiced costs to GOM Shelf and away from QNE in a manner that violated the TSA.  QNE did so by having vendors split invoices between GOM Shelf and QNE in percentages that were not reflective of the respective benefits each party received from the third-party service providers.  GOM Shelf effectively overpaid for the services it received while QNE underpaid for its services.  QNE used GOM Shelf and the TSA as a subsidy mechanism.   QNE directed at least one vendor to increase the percentage of expenses charged to GOM Shelf immediately after GOM Shelf gave notice that it was terminating the TSA.  Some of the invoices which QNE caused GOM Shelf to pay related to services and resources which benefited only QNE's assets and projects — not GOM Shelf's.

29.      Moreover, after repeated requests, QNE has been unable to adequately explain and provide support to clear numerous irregularities related to its management of bank accounts owned or otherwise controlled by GOM Shelf.  As one example, on 8/27/2021 $967,347 was swept from an operating bank account associated with a joint venture between a GOM Shelf subsidiary and two third-party entities.  QNE has been unable to provide authorizations from either GOM Shelf

or any other entities for this and other cash transfers from this bank account. Instead, on 4/13/2023, QNE provided a "Theoretical Balance" calculation and agreed that as of 8/27/2021 QNE owed $655,066 to that joint venture. However, in keeping with QNE's time-wasting, ever-changing positions, in a letter dated 4/24/2023, they recanted that this $655,066 is owed.

30.     As another example of QNE's accounting irregularities, during the transition of contract operations from QNE to COOL, it was discovered that QNE retained $180,598 of interest earned on GOM Shelf's bank accounts while it was contract operator from 8/27/2021–12/31/2022. It wasn't until QNE was confronted with this misappropriation that they immediately dug into their bag of tricks and, in a letter dated 4/24/2023, threatened to bill GOM Shelf additional interest that had allegedly accrued on funds owed by GOM Shelf during the term of the TSA. This assertion was frivolous, and QNE owes GOM Shelf $180,598 of stolen interest earned on GOM Shelf's bank accounts.

31.     Further, as of the date of this Petition, QNE has failed to provide all the files, books, records, employee work product and communications, and other documents that are the property of GOM Shelf. These documents and records are essential to GOM Shelf's ability to carry out its business, and for COOL to safely operate the Assets, and QNE is contractually obligated to turn them over to GOM Shelf under both the TSA and CTA. *See, e.g.,* Exhibit 1 at § 1.4. Rather than spending the time and effort to identify and transfer all documents and records owned by GOM Shelf, QNE chose instead to initiate a game of hide and seek and systematically set up barriers to communication and data gathering thereby requiring GOM Shelf's and COOL's employees and contractors to specifically make a request through a virtual data room and identify documents not transferred to GOM Shelf. Consequently, upon reasonable information and belief, hundreds if not thousands of vital records owned by GOM Shelf are still in QNE's hands.

32.     As of the filing of this Petition, QNE has neither released the more than $6 million in withheld revenue to GOM Shelf, returned to GOM Shelf at least the $1,993,308 that QNE overbilled it for services under the TSA, turned over GOM Shelf's various documents and records that QNE is improperly withholding, or otherwise made GOM Shelf whole for QNE's misconduct.

## V.     CAUSES OF ACTION

**COUNT 1:     BREACH OF CONTRACT, LA. CIV. CODE ART. 1986**

33.     GOM Shelf incorporates all preceding paragraphs here by reference.

34.     GOM Shelf had valid, enforceable contracts with QNE.

35.     GOM Shelf performed, tendered performance of, or was excused from performing their contractual obligations.

36.     QNE contractually represented, promised, and undertook the obligation to perform the various transition services described in the TSA.  These services included but were not limited to operating the Assets, maintaining the finance and accounting for the Assets (including managing the collection of any joint interest billings and revenue relating to the Assets), and maintaining and providing GOM Shelf with various documents and records concerning the operation of GOM Shelf's Assets.

37.     QNE further contractually represented, promised, and undertook the obligation to invoice GOM Shelf monthly for the "actual costs incurred" under the TSA, including the "actual time incurred" by QNE's full time employees in performing services under the TSA and GOM Shelf's portion of "shared costs."

38.     Moreover, QNE contractually represented and promised that it would market and sell GOM Shelf's production from the Assets under the HPSA.

11

39.    Furthermore, QNE contractually represented and promised that it would transfer to GOM Shelf data and records as required under the CTA.

40.    QNE violated its contractual duties under the HPSA and the TSA by refusing to properly disburse revenues from GOM Shelf's Assets to GOM Shelf.

41.    QNE further violated its contractual duties by submitting and causing GOM Shelf to pay invoices with purported costs and time incurred well in excess of the actual costs and time that QNE incurred under the TSA.

42.    Moreover, QNE violated its contractual duty to properly maintain the finance and accounting related to GOM Shelf's Assets, as reflected in the various accounting irregularities and improprieties that GOM Shelf has uncovered.

43.    QNE also violated its contractual duty under the CTA and TSA to transfer all files and records owned by GOM Shelf and has further failed to account for all files and records.

44.    GOM Shelf was damaged by QNE's breaches, including without limitation to the extent that QNE improperly withheld production revenues, as well as files and related records, from GOM Shelf, the extent that QNE caused GOM Shelf to pay invoices in excess of what QNE was properly owed, and the extent to which GOM Shelf has been injured by QNE's failures to properly maintain the finance and accounting related to GOM Shelf's Assets.

**COUNT 2:    BREACH OF FIDUCIARY DUTY**

45.    GOM Shelf incorporates all preceding paragraphs here by reference.

46.    QNE owed GOM Shelf a fiduciary duty because QNE acted as GOM Shelf's agent and mandatary under the TSA, particularly with respect to the handling of GOM Shelf's revenues. *See* La. Civ. Code Art. 2989, *et. seq.*; La. Stat. tit. 9 § 3802.

47.    Under Section 7.4 of the TSA, QNE expressly "agree[d] that if it handles cash on behalf of [GOM Shelf], it shall do so as an agent of [GOM Shelf] and shall be reasonably prudent in the handling of such cash as if it were handling its own cash."  *See* Ex. 1 at § 7.4. Moreover, QNE pledged that it "shall reimburse [GOM Shelf] dollar for dollar for the misappropriation of cash of [GOM Shelf] handled by [QNE] pursuant to [the TSA]." *See id.*

48.    QNE knowingly and intentionally violated its fiduciary duties to GOM Shelf by improperly withholding GOM Shelf's revenues which QNE collected and held as GOM Shelf's agent and mandatary.

49.    GOM Shelf was injured by QNE's breach, including without limitation to the extent that QNE improperly withheld, and is withholding, revenues from GOM Shelf.

**COUNT 3:    FRAUD, LA. CIV. CODE ART. 1953**

50.    GOM Shelf incorporates all preceding paragraphs here by reference.

51.    Under the TSA, QNE accepted and undertook a duty to accurately report its employees' time worked and shared costs incurred on GOM Shelf projects to GOM Shelf.

52.    Over the term of the TSA, QNE submitted to GOM Shelf invoices which contained material representations that QNE had provided services with total actual costs in excess of $69 million.  These invoices included the material representations that QNE had provided GOM Shelf with more than $50 million in employee time and that GOM Shelf was responsible for more than $19 million in shared and direct costs under the TSA.

53.    These material representations were false, because the services reflected on the invoices were not actually provided to GOM Shelf, GOM Shelf was not responsible for all of the shared and direct costs reported in those invoices, and the total actual costs of the services that QNE did provide under the TSA were significantly less than $69 million.

54.     At the time that QNE made these material representations, it knew that the material representations were false or made the material representations recklessly without the knowledge of their truth and as a positive assertion.

55.     QNE made the material representations with the intent to deceive GOM Shelf and that they should be acted upon by GOM Shelf, as QNE wanted GOM Shelf to pay for the excess costs recorded in the invoices.

56.     GOM Shelf reasonably relied and acted upon these material representations in the invoices, as it compensated QNE for the excess costs reported in the invoices.

57.     GOM Shelf was damaged by the false material representations made by QNE, including without limitation to the extent that QNE caused GOM Shelf to pay invoiced amounts in excess of what QNE was properly owed under the TSA.

**COUNT 4:    LOUISIANA UNFAIR TRADE PRACTICES ACT, LOUISIANA REVISED STATUTE 51:1401**

58.     GOM Shelf incorporates all preceding paragraphs here by reference.

59.     QNE's repeated fraudulent misrepresentations to GOM Shelf concerning the actual costs incurred under the TSA, and QNE's related overbilling of GOM Shelf, were unfair and deceptive acts and practices in the conduct of trade or commerce in violation of LA R.S. 51:1405.

60.     Moreover, QNE's improper withholding of GOM Shelf's revenues was not only a breach of its fiduciary duty to GOM Shelf — it was also an unfair and deceptive act and practice in the conduct of trade or commerce in violation of LA R.S. 51:1405.

61.     Furthermore, QNE's improper retention of files, books, records, employee work product and communications, and other documents that are the property of GOM Shelf is also an unfair act and practice in the conduct of trade or commerce in violation of LA R.S. 51:1405.

62.     As a consumer of QNE's services who has suffered a loss of both money and movable property as a result of QNE's unfair and deceptive acts and practices, GOM Shelf brings a private action under LA R.S. 51:1409.

63.     GOM Shelf was damaged by QNE's unfair and deceptive acts and practices, including without limitation to the extent that QNE caused GOM Shelf to pay invoices in excess of what QNE was properly owed under the TSA, the extent that QNE improperly withheld GOM Shelf's revenues under the TSA and HPSA, and the extent to which QNE has improperly retained possession of files and related records which are the property of GOM Shelf.  GOM Shelf has also incurred attorney's fees and costs due to QNE's conduct and seeks to recover those fees and costs pursuant to LA R.S. 51:1409(A).

## VI.     JURY DEMAND

64.     Plaintiff demands a trial by jury.

## VII.     PRAYER FOR RELIEF

65.     For the foregoing reasons, Plaintiff GOM Shelf LLC prays for the following relief:

a.   Actual damages,

b.   Exemplary damages,

c.   Reasonable attorneys' fees and costs, and

d.   All other monetary and equitable remedies to which Plaintiff is entitled.

Respectfully Submitted,

AHMAD, ZAVITSANOS & MENSING, PLLC

/s/John Zavitsanos
John Zavitsanos
Texas Bar No. 22251650
Shawn Bates
Texas Bar No. 24027287
Justin Kenney
Texas Bar No. 24126702
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Telephone: 713-655-1101
Facsimile: 713-655-0062
jzavitsanos@azalaw.com
sbates@azalaw.com
jkenney@azalaw.com

ATTORNEYS FOR PLAINTIFF
GOM SHELF LLC

## <u>CERTIFICATE OF CONSENT</u>

I certify that on July 26, 2023, Defendant QNE consented in writing to the filing of this First Amended Complaint, subject to its right to bring a motion challenging this pleading.  *See* Fed. R. Civ. Pro. 15(a)(2).

*/s/ Justin Kenney*
Justin Kenney